Roger Glenn MACKEY, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–74–278

Court of Criminal Appeals of Oklahoma.

Sept. 16, 1974.

Robert J. Boone, Wheeler, Parsons, Boone & Carpenter, James A. Loomer, Legal Intern, Oklahoma City, for appellant.

Larry Derryberry, Atty. Gen., James L. Swartz, Asst. Atty. Gen., William W. Gorden, Jr., Legal Intern, for appellee.

## OPINION

BUSSEY, Judge:

Roger Glenn Mackey, hereinafter referred to as defendant, was charged and tried in the District Court, Blaine County, for the offense of Illegal Distribution of Marihuana, a Controlled Dangerous Substance. (Case No. CRF–73–16). He was convicted by a jury verdict and in accordance with that verdict, was sentenced to imprisonment in the State penitentiary for a term of two (2) years and fined in the amount of Two Hundred ($200.00) dollars.

On appeal defendant presents six propositions of error. His first and second propositions assert that the trial judge erred in permitting the prosecution to impeach the testimony of State's witness Terry McSperitt. Defendant's contentions are well taken and as the errors set forth in these propositions require reversal of this cause we deem it unnecessary to discuss defendant's four other assignments of error. It is also unnecessary to set forth a recitation of the evidence adduced at trial except in so far as it is relevant to the issue of a party's impeachment of his own witness.

In reviewing the record of the conference held immediately prior to trial we are easily able to discern the District Attorney's anxiety about his witness McSperitt and the testimony he would give. At this conference, which took place on October 2, 1973, defense counsel presented a written statement executed by McSperitt on May 4, 1973, and asserted that the District Attorney's staff had intimidated and harassed McSperitt, a 19 year old youth, in a meeting they had with him the preceding day, October 1, 1973. According to the District Attorney's statements, the discussion on the previous day had progressed so unsatisfactorily that arrangements had been made to take McSperitt to Oklahoma City for a polygraph examination. From the District Attorney's recounting it appears that just prior to the time McSperitt was to leave, he agreed that he would "tell the truth" (Tr 5) and the trip was called off. From the District Attorney's perspective the "truth" was that McSperitt had observed the defendant sell marihuana to Officer Warren Wells on the night of February 20, 1973. From the District Attorney's statements it is clear that he felt the witness might not testify in this manner in order to protect the defendant.

The District Attorney was so dubious of the testimony his witness might give, he requested that ". . . if it appears necessary, and at the proper time, out of

the presence of the jury, (the trial judge) admonish this witness, Terry McSperitt, with regard to the perjury laws of the State of Oklahoma and the penalty therefor." (Tr 4) The trial judge properly refused this request and the conference culminated with the following:

"MR. GOERKE: Very good. In this same line, we would anticipate some hostility and would suggest that we might be confronted with that situation.

"THE COURT: What you are doing is advising defendant's counsel that he may be a hostile witness and you may want to impeach your own witness?

"MR. GOERKE: Yes.

"MR. BOONE: I object on impeaching their own witness. They can't eat their cake and have it, too. I think he is pretty well browbeat. I will go along with that, your honor." (Tr 6–7)

Called as a witness by the State, Terry McSperitt testified on direct examination that around 6:00 the evening of February 20, 1973, his friend Glenn Wanzer and Warren Wells (known to the witness at that time as Terry Colts) picked him up at his home in Watonga. The three of them then drove around Watonga drinking beer and then they drove to Kingfisher where they bought more beer. They then drove to Okarche whereupon they returned to Watonga. McSperitt testified that when they returned to Watonga they saw the defendant's car parked at the Mobil station. They stopped near it and Warren Wells left the car and walked over to the defendant's car. He testified that he observed Warren Wells standing beside defendant's car and that he saw a baggie of marihuana in Warren Wells' hand when he returned to their car. McSperitt stated that he recalled seeing a lot of people in the defendant's car but that he did not recall seeing the defendant in the car and that he did not recall having had a conversation with the defendant.

The District Attorney then began using cross-examination tactics on McSperitt in an effort to impeach his own witness by reference to a purported inconsistent statement.

"Q. [by Mr. Goerke] Did you make an oral statement yesterday to Hugh Compton, Sheriff of Blaine County, and to James Smith, Assistant District Attorney, relating to this incident?

"A. Yes. Me and my mom did.

"Q. At that time did you state that you were present when a purchase was made of marijuana from Roger Mackey by Warren Wells?

"A. Well, I don't remember. I was feeling pretty bad yesterday.

"Q. What is your recollection today? Were you present when a purchase was made by Warren Wells from Roger Mackey?

"A. Well, he came back with the dope, but I don't remember whether I was there with him or not.

"Q. Came back where?

"A. From Roger's car.

"Q. To your car?

"A. No. To his car.

"Q. Well, I mean to his car.

"A. Yeah.

"Q. One other question. Didn't you tell the Sheriff yesterday that during the transaction Roger Mackey was a dollar short of making change and that you supplied the dollar to make change to Warren Wells?

"A. No, I didn't. You said that to me yesterday.

"Q. Sir?

"A. I didn't say that. You said that to me yesterday.

"Q. You didn't make that statement to the Sheriff yesterday?

"A. No.

"Q. The only thing you recall is that Warren Wells came back from Roger Mackey's car with the dope?

"A. Yes.

"THE COURT: What do you mean by dope?

"A. Well, that little green bag they have been talking about, marijuana.

"THE COURT: Oh. Go ahead.

"MR. GOERKE: That's all." (Tr 20, 21)

Warren Wells was then called as a witness by the State. He testified that he was a police officer and that on the evening of February 20, 1973, he bought a baggie of marihuana from defendant while he was working on a special drug investigation for Blaine County officials. The trial judge then allowed the District Attorney to contradict and impeach McSperitt's testimony through the admission of hearsay evidence given by Officer Wells. Overruling defendant's objections to the admission of this hearsay evidence, the trial judge advised the jury that this testimony was being allowed only for the purpose of impeaching McSperitt and that their consideration of this testimony should therefore be limited to that purpose and that this testimony should not be considered as proof of defendant's guilt of the offense.

Essentially the impeaching statements are these:

"A. I asked Mr. McSperitt if he knew of anyone that had some dope for sale. He advised, 'Yeah, Mackey has some weed for sale.' (Tr 35)

\*    \*    \*    \*    \*    \*

"A. I asked Mr. McSperitt where we could find Mr. Mackey and he advised that he should be in town somewhere. I said, 'Where should we begin looking?' He said, 'Go to the Sonic.' We circled the Sonic and drove in the Sonic and drove out and did not see his car there.

"Q. [by Mr. Goerke] What type car were you looking for?

"A. Well, Mr. McSperitt told me it was a black over yellow 1967 Olds Cutlass." (Tr 36)

Testifying as to the events at the Mobil station, Mr. Wells stated that he parked two vehicles down from defendant's Cutlass and that:

"A. Mr. McSperitt says, 'There is Roger by his car.' I got out on the driver's side of my vehicle. Mr. McSperitt got out of the passenger side of my vehicle and we walked towards Mr. Mackey. Being as I was on the left-hand side of the car, I was a few steps behind Mr. McSperitt and, by the time that I walked up to where Mr. McSperitt and Mr. Mackey were, Mr. Mackey had a lid of marijuana in his hand." (Tr 37, 38)

Stating that defendant advised him the lid of marihuana would be twelve dollars and that he could not make change, Wells' testimony continued:

"A. Mr. McSperitt says, 'I'll loan you a dollar to make up the difference,' which he did, then gave me a dollar out of his own pocket. At this time I said, 'Thank you.' I put the baggie of substance in my right-hand front pocket." (Tr 39)

The rule of law governing a party's impeachment of his own witness is well settled in Oklahoma. In the well known case of Sturgis v. State, 2 Okl.Cr. 362, 102 P. 57 (1909), there is an instructive discussion by Judge Furman of the rule of a party's impeachment of his own witness who "surprises" the party relying on his testimony. In part he stated:

". . . the ancient rule prohibiting a party from impeaching his own witness has been modified in those particulars wherein experience and reason have shown it to be unjust. A party cannot now impeach his own witness by proving the bad character of such witness for truth, because this is something of which the party can and should inform himself before placing a witness upon the stand. But suppose a witness makes a statement to a party which would be highly beneficial to such party, and the party, thus having reasonable ground to believe that the testimony of the witness would be in

substance the same as the statement made, in good faith places the witness upon the stand, and the witness, instead of swearing to the statement previously made, testifies to matters which are injurious to the party calling him, it would be a manifest perversion of justice to say that the party so surprised, deceived, and imposed upon is bound by such testimony. Under these conditions the great weight of modern authority is that a party, upon grounds of surprise at and injury from the testimony so given, may, in the discretion of the trial court, offer in evidence previous statements of such witness which contradict the injurious portions of his testimony."

Explaining the rule in detail Judge Furman continued:

"But this rule is subject to certain conditions: First. The party must be surprised at the testimony of the witness sought to be so impeached, and this surprise must exist as a matter of fact; that is, it must be based upon such facts as would give the party reasonable ground to believe that the witness would testify favorably to such party. If the facts were such that the party had no reasonable ground to believe, when he placed such witness on the stand, that the witness would so testify, then no surprise could exist at the failure of the witness to give such testimony, and statements previously made by the witness, contradicting the testimony given, would not be admissible. Second. It is not enough that the witness failed to testify favorably to the party calling him, in order that previous contradictory statements made by such witness may be introduced in evidence, but the witness must have testified to facts injurious to the party calling him before he can be so impeached. In other words, such contradictory statements are permissible alone for the purpose of impeaching the witness, and are not original substantive evidence against the adverse party. Third. When such contradictory statements are admitted in evidence, under proper conditions, the court should clearly inform the jury that such contradictory statements can only be considered by them for the purpose of affecting the credibility of the witness, and that it is for the jury alone to determine whether they do have this effect or not, and that such contradictory statements are in no sense to be considered as original evidence against the adverse party." at 67, 68.

■ Neither of these two conditions which are necessary before a party may impeach his own witness were present here. The State was neither surprised at, nor injured by, McSperitt's testimony. As the record of the pretrial conference discloses, the District Attorney fully anticipated that McSperitt would testify exactly as he did. Any doubt the District Attorney may have had could have been resolved before McSperitt was called as a witness. In fact the District Attorney was so well aware that McSperitt would testify as he did that he (the District Attorney) did not even attempt to show surprise.

Speaking to this issue in the case of Darden v. State, 42 Okl.Cr. 6, 273 P. 1027 (1929) this Court stated:

". . . the record indicates that the counsel for the state was fully aware what the testimony of the witness would be before he was called to testify. It is well settled that, where a party is entrapped or deceived into placing a hostile witness on the stand, who then testifies contrary to the statements made, and to the belief of the party calling him, he may be impeached by the party calling him. On the other hand, a witness cannot be called to the stand, by a party knowing what his testimony will be, and then be impeached by showing he has made contrary statements. *Evidence to prove a substantive fact cannot be introduced by a purely hearsay statement under the guise of impeaching a witness.*" at page 1028 (Emphasis added)

Our decision of Weaver v. State, Okl. Cr., 446 P.2d 64 (1968) discusses good faith surprise by a party. Set forth therein is a statement from the case of Ellis v. United States, 138 F.2d 612, 616 (8th Cir. 1943) which is applicable to the instant situation:

"It might be contended with some cogency that the district attorney was disappointed rather than surprised in the strictest sense of the latter term."

Apart from the fact that McSperitt's testimony came as no surprise, it also caused no injury to the State's case. He corroborated Officer Wells' presence in Watonga on the evening in question, the fact that the defendant's car was at the Mobil station, the fact that Officer Wells went over to the defendant's car and returned with a baggie of marihuana. His testimony may not have been as detrimental to the defendant as the District Attorney desired, however, it was not injurious to the State and was therefore not capable of being impeached by the State.

The failure of a witness to testify as expected does not enable the party to impeach his testimony. In the case of Wiese v. State, 47 Okl.Cr. 59, 287 P. 1099 (1930), this Court stated:

"A party cannot impeach his own witness by introducing in evidence conflicting statements made by him, unless he should testify injurious to the party placing him on the stand, and, if the witness does not testify as the party expected him to do, affords no ground for the introduction in evidence of previous contradictory statements made by such witness."

Defendant also raises the issue of the court's failure to instruct the jury as to the effect they should give the impeaching testimony. As set forth above in our discussion of *Sturgis*, supra, the duty of the court to instruct the jury is based upon the assumption that the evidence was properly admitted in the first instance. Since the conditions of surprise and injury necessary to permit the introduction of the impeaching hearsay statements were absent here, it is not necessary for us to reach this question of instructions.

For the reasons stated herein, this case is reversed and remanded for a new trial.

BLISS, P. J., concurs.